## UNITED STATES v. ATLANTIC TRANSPORT CO.

(Circuit Court of Appeals, Second Circuit. May 8, 1911.)

No. 253.

1. ALIENS (§ 54½,* New, vol. 12, Key No. Series)—IMMIGRATION ACTS—CONSTRUCTION—"SEAMEN."

Horsemen, signed for service on a vessel in caring for horses during a voyage, are "seamen," for the purpose of determining the application to them of the immigration acts.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 7, pp. 6374, 6375.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. ALIENS (§ 54½,* New, vol. 12, Key No. Series)—CONSTRUCTION OF IMMI-GRATION ACT—HEAD TAX—SEAMEN.

Immigration Act Feb. 20, 1907, c. 1134, § 1, 34 Stat..898 (U. S. Comp. St. Supp. 1909, p. 447), which requires the levy and collection of a head tax of $4 "for every alien entering the United States," such tax to be paid by the master, agent, owner, or consignee of the vessel or trans-portation line, applies to seamen who are signed by a vessel for a voyage to a port of the United States, but not for the return voyage, and who, in accordance with the contract and intention of the parties, are dis-charged on the arrival of the vessel and enter the United States.

Ward, Circuit Judge, dissenting.

In Error to the District Court of the United States for the South-ern District of New York.

Action at law by the United States against the Atlantic Transport Company. Judgment for defendant, and the United States brings error. Reversed.

This cause comes here upon appeal from a judgment sustaining demurrer to the complaint in an action brought by the United States to collect from defendant head tax levied by the collector of the port of New York, under the provisions of section 1 of the immigration act of February 20, 1907, on three persons whom defendant brought here on its steamship Minneapolis. The persons in question are aliens. They were employed on the ship in the capacity of "horsemen"; that is, "to care for horses carried upon said ship on said voyage." They were paid regular wages and signed on the ship's articles for the voyage to the United States, but not for the return voyage. Upon arrival they were duly discharged by the captain, and entered the United States with his knowledge and consent, and have not since returned to the ship. The collector levied upon defendant a tax of $4 for each of them. Payment thereof has been demanded and refused.

Henry A. Wise, U. S. Atty., and A. S. Pratt, Asst. U. S. Atty.

Burlingham, Montgomery & Beecher (W. S. Montgomery, of coun-sel), for defendant in error.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. [1] These "horsemen," like all others who sign a ship's articles for a voyage or succession of voyages, being part of the ship's company, may be considered as seamen, so far as the immigration acts are concerned.

Section 1 of the act of February 20, 1907, provides:

"That there shall be levied, collected and paid a tax of four dollars for every alien entering the United States. The said tax shall be paid to the collector of customs of the port or customs district to which said alien shall come, * * * by the master, agent, owner or consignee of the vessel, transportation line or other conveyance or vehicle bringing such alien to the United States. * * * The tax imposed by this section shall be a lien upon the vessel * * * and shall be a debt in favor of the United States against the owner or owners of such vessel," etc.

Earlier statutes had imposed a head tax "for each and every pas-senger not a citizen of the United States who shall come by steam or sail vessel from a foreign port to any port within the United States." Act Aug. 3, 1882, c. 376, 22 Stat. 214 (U. S. Comp. St. 1901, p. 1288); Act Aug. 18, 1894, c. 301, 28 Stat. 391 (U. S. Comp. St. 1901, p.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2459); Act March 3, 1903, c. 1012, 32 Stat. 1213. The suggestive changes made by the later statute are the imposition of the tax upon all aliens, whether they come here as "passengers" or not, and the substitution for the phrase "come by vessel from a foreign port to any port within the United States" of the phrase "entering the United States." A person may properly be said to "come to" this port if he arrives here in a vessel, even though he intends to remain on board and depart with the vessel when she sails; but the phrase "entering the United States" would seem to signify a permanent separation from the vessel.

[2] Aliens who arrive here as did the three referred to in the complaint, themselves and the master of the vessel both intending that upon arrival they shall sever their connection with the vessel and enter the United States, are certainly within the enumeration of section 1, supra. The sole contention of the defendant is that alien seamen are not within the immigration act for any purpose.

In a former decision (Taylor v. U. S., 152 Fed. 1, 81 C. C. A. 197) we discussed the successive immigration acts at some length and set forth the reasons why a majority of this court were of the opinion that all alien seamen were included in its provisions. That case went to the Supreme Court on certiorari, and it was there contended that the act of 1903 and its several provisions were not intended to apply to bona fide seamen. The alien seaman in that case had signed for the return voyage, and it was the intention of the master that he should remain on the ship and sail with her. The section (18) under consideration was one making it the duty of owners and officers of vessels "bringing any alien to the United States to prevent the landing of such alien at any time or place other than such as the immigration officers might designate." The alien seaman had deserted while the ship lay at her wharf, which was not such a designated place, and the master was prosecuted for violation of section 18. The Supreme Court did not sustain the contention of the plaintiff in error. All that it held was that section 18 did "not apply to the ordinary case of a sailor deserting while on shore leave." The court said:

"The section does not apply to sailors carried to an American port with a bona fide intent to take them out again when the ship goes on, when not only was there no ground for supposing that they were making the voyage a pretext to get here, desert, and get in, but there is no evidence that they were doing so in fact. Whether this result is reached by the interpretation of the words (in section 18) 'bringing an alien to the United States' that has been suggested, or on the ground that the statute cannot have intended to apply to the ordinary and necessary landing of seamen, even if the words of the section embrace it, as in Church of the Holy Trinity v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, does not matter for this case."

In the subsequent case which was before this court (U. S. v. International Mercantile Marine Co., 171 Fed. 841, 96 C. C. A. 420), the alien was a seaman who had signed articles for the round voyage, here and return, and had deserted while the vessel was in this port.

There being no question here of any desertion, but a conceded intention of all parties that on arrival he should leave the ship perma-

nently and enter the United States, the case is not within the exception declared by the Supreme Court, and the provisions of section 1 of the act of 1907 apply.

The judgment is reversed.

WARD, Circuit Judge (dissenting). If the substitution of the word "alien," in the first section of the act of February 20, 1907, for the word "passenger," used in the former acts, were the only change made in the law, the argument founded on it would be stronger. But the word "alien" was substituted throughout the act for the words "alien immigrants" or "immigrants" used in former laws. The horsemen in question were seamen on the British steamship Minneapolis. This would be so by statute as to American vessels (Rev. Stat. U. S. 4612 [U. S. Comp. St. 1901, p. 3120] ; see, also, The Minna [D. C.] 11 Fed 759), and is so as to British vessels by chapter 60, 57 & 58 Vict. 742. There is no evidence that they were shipped for the purpose of evading the immigration law. Though it happens that the persons now under consideration are horsemen and the particular provision of the immigration law involved is the head tax, it seems to me to follow from the decision that all alien seamen who are paid off under their articles in this country fall within the definition of aliens throughout the immigration law. The word literally covers seamen, but I cannot believe it was the intention of Congress to include them. Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226. They belong to an ambulatory class. There is no presumption that when they are paid off here they will stay here. If there be any presumption, it is to the contrary—that they will continue to follow their calling on the sea. The complaint does not charge that the seamen in question intended to remain in the United States, although they were paid off. Rule 22, subd. "d," of the Bureau of Immigration and Naturalization, enacted after the passage of the present law, provides that no head tax is due on such seamen. It is as follows:

"Head tax shall not be assessed on account of bona fide seamen landing in the pursuit of their calling. On account of such as are discharged with the intent to remain in the United States, and on account of those who are found or shown to have deserted and remained in the United States, the head tax shall be assessed."

It is true that the cases of Taylor v. United States, 207 U. S. 120, 28 Sup. Ct. 53, 52 L. Ed. 130, and United States v. International Mercantile Marine Co., 171 F. 841, 96 C. C. A. 420, concerned deserting seamen; but it does not necessarily follow from what was said in them that seamen who are paid off at the termination of their agreements here must be held to be within the immigration law.

For these reasons, I feel compelled to dissent from the opinion of the court.